**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph Edward GORDON,
Defendant-Appellant.**

**No. 74–3034.**

United States Court of Appeals
Ninth Circuit.

Nov. 21, 1975.

Ron Minkin, Los Angeles, Cal., for defendant-appellant.

Wilfred A. Hearn, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

OPINION

Before KOELSCH and CHOY, Circuit Judges, and SOLOMON,* District Judge.

SOLOMON, District Judge:

The principal issue in this appeal is whether the defense of duress is available to one who asserts that he committed an illegal act to protect the lives of friends.

Gordon, the appellant, admits that he possessed and sold 250,000 amphetamine tablets, but he asserts that he did it because of threats to himself and two friends by the undercover agent to whom he sold the drugs.

---

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

The trial court excluded the friends' testimony on duress. The defendant was convicted and he appealed. We affirm.

Early in 1974, Reavis agreed to sell amphetamines to Steve Campbell, a part-time Federal narcotics undercover agent. The sale, which was scheduled to take place in Palm Springs, California, was never completed.

Thereafter Gordon was introduced to Reavis by their mutual friend Snyder.

On May 9, 1974, Reavis in Phoenix called Campbell in Chicago and told him that he knew where Campbell could buy amphetamines. Reavis introduced Campbell to Gordon over the telephone. Gordon and Campbell arranged a sale in Los Angeles. This was Campbell's first knowledge of Gordon.

Three days later, at Campbell's request, Gordon sent Campbell a Chicago-to-Los Angeles airplane ticket. The next day both Campbell and Gordon arrived in Los Angeles and checked into separate rooms at the Marriott Hotel.

About 8:00 that evening, Gordon and Campbell met in the hotel lounge. Campbell introduced Gordon to his three "bodyguards", also undercover agents. After a short discussion, Gordon agreed to make the sale.

Gordon, Campbell, and one of the "bodyguards" went to Gordon's room, where they discussed the abortive Palm Springs sale. Gordon testified that Campbell said he was upset with Reavis and his associate Pearson, whom he blamed for the collapse of the sale. Campbell testified that he and Gordon renegotiated the price of the amphetamines. Gordon denied it. Gordon, Campbell, and the other agent then continued their conversation in the hotel lobby.

Between 11:00 p. m. and 1:15 a. m., at least five telephone calls took place between Los Angeles and Phoenix. Campbell and Reavis spoke three times. Gordon and Reavis once, and Gordon and Snyder once.

About 1:30 a. m. Campbell went to Gordon's room. Gordon left and re-turned with a suitcase containing the tablets, which he showed to Campbell.

Gordon and Campbell talked until 5:30 a. m. Campbell testified that their discussions were friendly, but Gordon testified that Campbell kept pressuring him. He said that Campbell periodically threatened his life. Gordon also testified that he changed his mind about making the sale several times. He said that when Campbell threatened him again at 5:30, he told Campbell the sale was off, and they parted.

About 7:00 a. m. Gordon changed his mind again and agreed to the sale. About 10:00 a. m. three undercover agents went to Gordon's room. Gordon left and returned with the suitcase containing the amphetamines. Gordon was then arrested.

At the trial, Gordon asserted three defenses: entrapment, duress to others, and duress to himself. On appeal he abandoned the defense of entrapment. On duress, he said that he became involved in the drug sale because of Campbell's threats to Reavis and Pearson, and that he finally decided to go through with the sale because of Campbell's threats to Gordon himself.

The classic definition of duress or coercion appears in *Shannon v. United States*, 76 F.2d 490, 493 (10th Cir. 1935):

> Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion . . . . .

■ For a defendant to successfully urge duress as a defense, he must show that the threat and the fear which the threat caused were immediate and involved death or serious bodily injury. He must also show that the fear was well-grounded and that there was no reasonable opportunity to escape.

On Gordon's defense of duress to others, he offered to prove through the tes-

timony of Reavis and Pearson, to be corroborated by Snyder, that Campbell had made threats against Reavis and Pearson.

The offer of proof was both confusing and inadequate. The trial judge summarized his understanding of it in this colloquy with counsel:

THE COURT: . . . I think you have made your offer of proof . . . . The court is satisfied that there is not [a] deficiency in your offer of proof; to wit, that you want to call Reavis and Pearson to testify that . . . the man called Steve [Campbell] was in frequent contact with them for a period of several weeks in Phoenix?

MR. MINKIN: Yes, your Honor.

THE COURT: With respect to the question of securing a purchase of illegal pills by Steve and that he was acting . . . as a Government undercover agent. And if you want to also have them testify that Steve said to . . . each of them at different times, "Well, you had better produce some pills or else," meaning some kind of a threat——

MR. MINKIN: Yes, your Honor.

THE COURT: And so I am denying that offer of proof.

Elsewhere Gordon offered to prove that Campbell threatened Reavis and Pearson with death. The offer therefore met the requirement of seriousness.

■ Even when broadly construed, the offer of proof did not meet the test of immediacy. When Campbell was in Chicago, Reavis and Pearson were in Phoenix, and Campbell's threats came over long-distance telephone. Later, when Campbell and Gordon met in Los Angeles, Reavis and Pearson remained in Phoenix, several hundred miles away. Neither of them was held or watched by Campbell or his associates.

Nor did Gordon's offer of proof on duress to others assert that his friends had no opportunity to escape Campbell's threats. Avenues of escape were always available, both to Gordon and to Reavis, and Pearson. If they had not been selling drugs, they could have sought police protection.

With commendable frankness, Gordon's counsel concedes that he has found no authority which would support the defense of duress to others not related to the accused.[1] But, Gordon argues, even if that defense is disallowed, the testimony of the four excluded witnesses would have supported Gordon's well-grounded belief that his own life was in danger. Gordon therefore contends that the offer of proof was relevant to the defense of duress to self.

■ Gordon failed to prove or offer to prove the necessary elements of immediacy and inescapability. The testimony of his friends was not offered to prove, and it could not have proved, that the threat of death to Gordon was immediate or that Gordon could not have escaped. During the night of May 13–14, Gordon was never physically restrained or prevented from seeking help. From 5:30 a. m. to 10 a. m. he was outside the presence of the agents. Gordon's own testimony negates two necessary elements of the defense of duress to self. The testimony of his friends would not have supplied those elements, and the exclusion of this testimony was proper.

Affirmed.

---

1. Duress to a member of one's family would probably suffice. There might be situations in which the defense of duress to others not related to an accused would be available. But, as Chief Judge Magruder pointed out, the case would have to involve circumstances that were "strong, dramatic and convincing." *R. I. Recreation Center, Inc. v. Aetna Casualty & Surety Co.,* 177 F.2d 603, 606 (1st Cir. 1949) (concurring opinion).

New York recognizes duress to a third person as an affirmative defense. N.Y.Penal Code § 40.00 (McKinney 1966).