28 F.3d 1215
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Barbara WADDELL, Defendant-Appellant.
 No. 93-3982.
 United States Court of Appeals, Sixth Circuit.
 June 22, 1994.
 
 Before: KEITH and SUHRHEINRICH, Circuit Judges; and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Barbara Waddell ("Waddell") appeals her jury convictions and sentences imposed for conspiracy and unarmed bank robbery. Waddell argues the district court erred by: requiring a factual predicate before allowing expert testimony; substituting its own jury instruction for her requested instruction on duress; failing to grant her motion for acquittal based on insufficiency of the evidence; denying her a two-level reduction for acceptance of responsibility; and failing to depart downward for an imperfect defense of duress. For the reasons stated below, we AFFIRM her conviction and sentence.
 
 I. Facts
 
 2
 During the summer of 1992, Alonzo Brooks ("Brooks") and Zeta Beatrice James ("James") lived with Waddell. The couple met Waddell through her boyfriend Michael Moss ("Moss"). As detailed below, during the months of July and August, Waddell, Brooks, James and others committed numerous bank robberies and engaged in frequent drug use.
 
 
 3
 On July 17, 1992, Brooks, James and Charles Simms ("Simms") robbed a branch of the Provident Bank in Dayton, Ohio. The three split the proceeds of the robbery which was later determined to be $1,150.[2] After the robbery, the three bought heroin and Brooks and James returned to Waddell's residence. The two then discussed the robbery with Moss and used drugs.
 
 
 4
 On July 25, 1992, Brooks and James robbed a Dayton branch of the First National Bank. James entered the bank and stole $471. The two purchased heroin with the proceeds and they returned to Waddell's home. Also present on this day were Waddell's brother Kermon James Waddell ("Kermon") and his girlfriend Johnnie JoAnne Walker ("Walker"). Everyone used drugs and discussed both robberies.
 
 
 5
 On July 27, 1992, Brooks and James robbed a Dayton branch of the Citizens Bank. James entered the bank and stole approximately $730. Later, James threw the bag and the money from the car after a dye pack hidden with the money exploded. The two returned to Waddell's residence and discussed the incident. Waddell suggested using her car to recover the discarded money. Thereafter, Moss, Kermon, Walker and Brooks drove Waddell's car to the location of the money. Because Police were on the scene, they failed to recover the money and returned to Waddell's house empty handed.
 
 
 6
 At that time, the group, including Waddell and Walker, planned to rob a branch of the Fifth Third Bank in Dayton. On July 28, 1992, Brooks, James and Kermon went to the bank. Kermon brandished an air gun while James approached a teller. The men escaped with $4,774 which all three split. They then purchased drugs, and returned to Waddell's residence. Each gave Waddell a portion of the robbery proceeds. Waddell gave her share to Brooks to purchase cocaine for her. Later, James, Brooks, Kermon and Walker used heroin and cocaine and Waddell used cocaine.
 
 
 7
 The following day, a television news program detailing the robberies broadcast James' picture as a suspect. The group decided James had to leave town and Waddell purchased an airline ticket for James. Later, James flew to Fort Worth, Texas.
 
 
 8
 On August 4, 1992, Waddell, Brooks, Kermon and Walker drove Waddell's car to Columbus to rob a bank. Upon arrival at the Heartland bank, Kermon was too sick from heroin to participate in the robbery. Waddell and Walker entered the bank where Walker brandished a fake gun and told the teller: "This is a robbery, I'm not kidding. You need to give me all your money." After the teller turned over the money, Waddell ordered: "That's not all bitch, give me all your fucking money." The women escaped with $2,290 which the group used to purchase heroin and cocaine. The four then returned to Dayton and used drugs. Kermon and Walker testified at trial that on this occasion Waddell freely snorted and injected cocaine.
 
 
 9
 On August 7, 1992, after the group had been using drugs and Waddell had fallen asleep, Kermon, Brooks and Walker discussed robbing the Star Bank in Dayton. The discussions continued the following morning, at which time Waddell voiced her willingness to participate. Waddell suggested they all enter the bank to get the most money. The next day, the four drove Waddell's car to the Star Bank. Although Waddell had previously done business at this branch, she volunteered to rob the bank. Subsequently, Kermon robbed a teller using a stun gun and escaped with $13,318. The four split the money and because Waddell complained of financial difficulties, she received an extra $2,600.
 
 
 10
 The four then returned to Waddell's house, changed clothing and decided to go to Columbus. Before the trip, Waddell telephoned Philip Dreety ("Dreety"), an employee at Don's Pawn Shop and a high school acquaintance, and informed him she planned to redeem some pawned jewelry. That afternoon, while Waddell redeemed her jewelry, Brooks, Kermon and Walker remained in her car. Inside Don's Pawn Shop, Waddell exchanged pleasantries with Dreety and went to a private screened area where she redeemed her jewelry for over $1,000 cash. According to both Dreety and another employee, both Waddell's appearance and demeanor were normal.
 
 
 11
 The group then travelled to Columbus in Waddell's car. At a hotel in Columbus, the group used drugs and Waddell injected cocaine. Later, Waddell accused Walker of stealing some cocaine and a separate argument ensued concerning Waddell's intravenous drug use.[3] Kermon and Walker, agitated over Waddell's greed and the disagreements, decided to return to Dayton without her. Consequently, Brooks, Kermon and Walker rented a Cadillac and drove back to Dayton. Waddell returned to Dayton alone in her own car.
 
 
 12
 On August 10, the four reunited and decided to drive the Cadillac back to Columbus to rob a branch of the National Bank of Detroit ("NBD"). Waddell suggested that all four enter the bank but Kermon refused. Waddell became angry with Kermon and eventually she and Walker entered the bank. After the robbery, the women rejoined Brooks and Kermon but Waddell would not show the robbery proceeds to her cohorts. Instead, she kept the money in her possession until they arrived in Dayton where she produced only $400. Brooks became angry and he, Kermon and Walker accused Waddell of pocketing the other money.[4]
 
 
 13
 The three then left Waddell's house. Later, Brooks, suffering from heroin withdrawal, returned to Waddell's house looking for the rest of the money. Brooks ransacked the house and threatened Waddell. Kermon later stated that Brooks "terrorized ... and tore up her house and tied her up on the living room floor and he might have physically abused her." Later that night, Waddell purchased heroin for Brooks.
 
 
 14
 On August 17, 1992, Brooks, Kermon and Walker were arrested after committing a bank robbery. Two days later, FBI Special Agent Jeffrey Lindsey arrested Waddell and interviewed her about the robberies. Soon after the arrests, Waddell telephoned Walker and suggested their defense to the charges should be that they were so high on drugs they did not know what they were doing.
 
 
 15
 On September 17, 1992, a federal grand jury for the Southern District of Ohio returned a five count indictment charging Waddell, Brooks, Kermon, James and Walker with:
 
 
 16
 (1) conspiring to commit bank robberies in violation of 18 U.S.C. Sec. 841 and Sec. 2113(a) (Count 1 and 2);
 
 
 17
 (2) committing armed bank robbery in violation of 18 U.S.C. Secs. 2113(a) and (d) and 2 (Counts 3 and 4); and
 
 
 18
 (3) committing unarmed bank robbery in violation of 18 U.S.C. Secs. 2113(a) and 2 (count 5).
 
 
 19
 On May 17, 1993, a jury trial commenced at which Brooks, Kermon and Walker testified against Waddell pursuant to agreements with the government. The defense offered several witnesses who testified as to Waddell's demeanor during the time period of the robberies. Waddell's mother and brother testified that although Waddell was normally vibrant and outgoing, during this period she appeared anxious and withdrawn and generally depressed. Waddell's neighbor testified about the condition of Waddell's ransacked house and how terrified Waddell had been.
 
 
 20
 Further, Waddell called Dr. Franklin D. Hurt, Jr. ("Dr. Hurt"), a practicing psychologist, as an expert in the field of forensic psychology. The district court conducted voir dire to establish the relevancy of Dr. Hurt's testimony. During voir dire, Dr. Hurt testified that after Waddell's arrest, he conducted an in-depth interview with Waddell and later conducted three clinical interviews. During the interviews, Dr. Hurt elicited background information, and conducted mental status examinations and psychological testing. From these examinations, Dr. Hurt determined that Waddell suffered from Post Traumatic Stress Disorder ("PTSD").
 
 
 21
 Further, Dr. Hurt testified that rather than assuming Waddell was telling the truth, he compared her claims with objectively identifiable data. Specifically, he verified information by speaking to Waddell's mother, brother and friends and administered several accepted psychological tests.[5] Based on the results, Dr. Hurt diagnosed Waddell as suffering from PTSD, major recurrent mild to severe depression, cocaine dependence, and an obsessive compulsive personality disorder. Dr. Hurt further opined that Waddell's PTSD resulted from being held against her will by Brooks, Kermon and Walker. According to Dr. Hurt, Waddell's "condition," rendered her unable to resist coercion applied against her by the other three.
 
 
 22
 After conducting voir dire, the court found no factual foundation existed supporting Dr. Hurt's testimony and prohibited his testimony at that time. Defense then called Waddell to the stand to establish a factual predicate.
 
 
 23
 Waddell testified to being a prisoner in her own home. According to Waddell, Brooks, Kermon and Walker physically restrained and abused her. She testified that on many occasions, the other three injected her with cocaine and heroin against her will and tied her up with ropes. Eventually, according to Waddell, she agreed to do anything the other three wanted. At this point, the others told her she must participate with them in bank robberies to incriminate herself so she could not report them to the police. According to Waddell, she agreed because she believed her life was in danger. After two robberies, Waddell testified that the others left her alone. After Waddell testified, the district court allowed Dr. Hurt to take the stand and he testified much as he did on voir dire.
 
 
 24
 On May 20, 1992, the jury convicted Waddell of the conspiracy charge in count one; the lesser included offense of unarmed bank robbery in count three; and the unarmed bank robbery charge in count five. At an August 27, 1993, sentencing hearing, the judge rejected a probation officer's recommendation that Waddell receive a two-level reduction for acceptance of responsibility. The judge also rejected Waddell's request for a downward departure for an incomplete defense of duress pursuant to U.S.S.G. Sec. 5K2.12. The court sentenced Waddell to 60 months imprisonment on count one to run concurrently with an 84 month term imposed for counts three and five. This timely appeal followed.
 
 II. Discussion
 On appeal Waddell argues:
 
 25
 (1) the district court erred by requiring the laying of a foundation before allowing an expert to testify;
 
 
 26
 (2) the district court's jury instruction on duress was erroneous;
 
 
 27
 (3) the evidence was insufficient to sustain her convictions;
 
 
 28
 (4) the district court erred by failing to grant her a two-level reduction for acceptance of responsibility; and
 
 
 29
 (5) the district court erred by refusing to depart downward based on duress.
 
 
 30
 We discuss each allegation below.
 
 A. Expert Testimony
 
 31
 Waddell argues the district court misapplied Federal Rule of Evidence 703 by refusing to allow Dr. Hurt's testimony without a factual foundation. Waddell notes that Rule 703 specifically allows for the admission of expert testimony even when such testimony is based on inadmissible hearsay. Waddell asserts first, the trial court committed reversible error by requiring a factual foundation and second, the district judge violated her Fifth Amendment right against self-incrimination by requiring that she take the stand to establish such foundation. We disagree.
 
 
 32
 During a relevancy hearing, the court found that Dr. Hurt's testimony relied on "rank hearsay" from the clinical interviews, would bring "self serving statements" before the jury, and such statements were "beyond the ability of the government to cross examine...." Based on these findings, the court found that there were no sufficient facts in the record to support Dr. Hurt's opinions. The court then stated:
 
 
 33
 Now, it may be that counsel will be able to furnish a significant factual predicate to be able to ask him hypothetical questions which would elicit the opinion that defense counsel wishes to elicit, but at the present stage of this case, that factual predicate just does not exist.
 
 
 34
 (JA p. 112) Thereafter, defense counsel called Waddell to the stand.
 
 
 35
 1. The District Court Did Not Violate Waddell's Fifth Amendment Right Against Self-Incrimination
 
 
 36
 The district court did not require that Waddell take the stand to lay a foundation for Dr. Hurt's testimony. In fact, the trial court suggested using hypothetical questions to elicit a factual basis from which the jury could evaluate the testimony. Regardless of whether a factual predicate was necessary, Waddell and defense counsel decided to put Waddell on the stand. The trial court did not infringe upon Appellant's Fifth Amendment right against self-incrimination.
 
 2. Dr. Hurt's Testimony Was Excludable
 
 37
 The district court could have excluded Dr. Hurt's testimony under Rules 703 and 704 and, therefore, the district court arguably erred in Waddell's favor by allowing his testimony. Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:
 
 
 38
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 39
 Fed.R.Evid. 702. "An additional consideration under Rule 702--and another aspect of relevancy--is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." See United States v. Downing, 753 F.2d 1224, 1242 (3d Cir.1985) (cited with approval in Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 2795, 1993 U.S. LEXIS 4408, at * 20 (June 28, 1993)).
 
 
 40
 In Daubert, the Court explained that Rule 702 must be read in conjunction with other applicable rules of evidence. 113 S.Ct. 2786, 2797-2798, 1993 U.S. LEXIS 4408, at * 28. The applicable rules of evidence in this case are Rules 703 and 704. Rule 703 provides that where expert opinions rely on otherwise inadmissible hearsay, the opinions will be admitted only where the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[6] Fed.R.Evid. 703. Advisory Notes to Rule 703 specify that an expert may rely on statements by patients and relatives and that the physician's validation of such hearsay statements "ought to suffice for judicial purposes." Notes of Advisory Committee on 1972 Proposed Rules.
 
 
 41
 Here, the district court erroneously assumed because Dr. Hurt relied upon interviews and hearsay statements he could not testify until the underlying facts were presented to the jury. Because the Federal Rules of Evidence have abandoned "the exacting requirements that traditionally have called for admissibility of all of the underlying facts," Rule 703 allows for the admission of expert testimony based on otherwise inadmissible hearsay. See Graham C. Lily, An Introduction to the Law of Evidence Sec. 12.2, at 489 (1987).
 
 
 42
 In this case, however, two problems exist. First, at the time it was offered, Dr. Hurt's testimony did not satisfy Rule 702's benchmark requirement that expert testimony aid the jury. Here, no evidence of duress or coercion had been introduced, therefore Dr. Hurt's testimony would not aid the jury in understanding the evidence nor in resolving factual disputes as required by Rule 702. Thus, the testimony was excludable under Rule 702. See Downing, 753 F.2d at 1242.
 
 
 43
 Further, Dr. Hurt's testimony was excludable under Rule 704. In criminal cases, Rule 704 forbids experts from stating opinions or inferences "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or the defense thereto." Fed.R.Evid. 704(b). This restriction serves to
 
 
 44
 confine the expert--usually a psychiatrist--to his field of expertise, namely, the nature of the mental disease in question, its characteristics and its manifestations. The issue of whether the accused's mental condition provides a partial or complete legal excuse for his conduct is left to the trier.
 
 
 45
 See Lily, Sec. 12.2 at 490.
 
 
 46
 The Ninth Circuit held that expert testimony regarding a defendant's mental state and motivation was properly excluded under Rule 704. United States v. Lewis, 837 F.2d 415 (9th Cir.), cert. denied 488 U.S. 923 (1988). In Lewis, the court held expert testimony was inappropriate where "[t]he defendant has failed to establish that the psychiatrist's testimony would have concerned a topic requiring expert testimony but would not have gone to the defendant's state of mind. " 837 F.2d at 418. Here, Dr. Hurt's testimony was intended to establish the entire defense of duress. Clearly this went to the ultimate issue of the case--whether the defense had been established. Further, Dr. Hurt's testimony, although he purported to testify about PTSD and related psychoses, was inextricably intertwined with an ultimate conclusion about Waddell's state of mind--an issue properly left for the jury.
 
 
 47
 3. The District Court Properly Required a Factual Predicate
 
 
 48
 Here, the district court allowed Dr. Hurt to testify but required the laying of a factual predicate. We review the trial court's admission of expert testimony for an abuse of discretion. Mitroff v. Xomox Corp., 797 F.2d 271, 275 (6th Cir.1986). Even if the trial court abuses its discretion, a new trial is not warranted unless "substantial rights of a party are affected." Fed.R.Crim.P. 52(a); Rye v. Black and Decker Manufacturing Co., 889 F.2d 100, 103 (6th Cir.1989). Thus, an abuse of discretion that does not affect substantial rights is harmless error and is to be disregarded. Fed.R.Crim.P. 52(a).
 
 
 49
 Here, because the testimony was excludable, Waddell arguably received a windfall from its inclusion. Such testimony did not, however, persuade the jury on the issue of duress. Although the district court determines the admissibility of expert testimony, any questions concerning the weight given to such testimony are properly left to the jury. See Obieli v. Campbell Soup Co., 623 F.2d 668, 670 (10th Cir.1980) (noting they were not inclined to disturb a jury determination disregarding the weight of an expert's testimony). Here Waddell was not prejudiced by the district court's decision to allow Dr. Hurt's testimony.
 
 
 50
 Further, although Rule 703 does not require the establishment of a factual predicate, the district court did not err by requiring this information for the following reasons. Here, the defense alleged the affirmative defense of duress. As such, the defendant was required to introduce evidence on all elements of the defense. See United States v. Campbell, 675 F.2d 815, 821 (6th Cir.), cert. denied, 459 U.S. 840 (1982). We have held the trial court may require the accused to produce evidence supporting a coercion defense, which, if sufficient, will then be instructed upon. Id. Thus, the defendant has the burden of introducing sufficient facts to establish the elements of the defense of duress or coercion which are:
 
 
 51
 (1) an immediate threat of death or serious bodily harm which requires the defendant commit the criminal act (immediacy);
 
 
 52
 (2) the situation must be one where there was no opportunity to avoid the danger (inescapability); and
 
 
 53
 (3) the offender must surrender once the threat abates.
 
 
 54
 Where all the requirements of the defense are not addressed, "the trial court is not obligated to allow the evidence to remain for consideration." Campbell, 675 F.2d at 821 (citing United States v. Gordon, 526 F.2d 406, 408 (9th Cir.1975)).
 
 
 55
 The defense called Dr. Hurt to testify before presenting any facts supporting duress. Under Cambell, a trial court may properly require the accused to present facts giving rise to such offense. Thus, the district court's requirement of a factual predicate, although not necessary within the realm of expert testimony, was sound within the purview of the duress defense and no error occurred. In addition, as discussed above, without some facts in the record, Dr. Hurt's testimony would not have aided the jury in any way.
 
 
 56
 Here, no abuse of discretion occurred because Dr. Hurt's testimony was properly excludable and Waddell was not prejudiced by its inclusion. Despite Waddell's allegations, the district court never required she take the stand. The court, however, properly required independent proof supporting an asserted affirmative defense.
 
 
 57
 B. The Jury Instruction for Duress Was Not Erroneous
 
 
 58
 Appellant next argues the district court reversibly erred by substituting its own duress instruction for her requested jury instruction. Waddell alleges that she submitted a Sixth Circuit Pattern Jury Instruction which included a subjective reasonableness inquiry, thus taking into account the question of a defendant's personal psychological makeup. Waddell argues the district court's instruction, on the other hand, provided a purely objective question of reasonableness under the circumstances. Although Waddell makes an interesting argument it must fail for two reasons, each discussed below.
 
 
 59
 1. The District Court Was Not Bound to Instruct the Jury on Duress
 
 
 60
 First, as a matter of law, Waddell failed to present a prima facie case of duress. The law is clear that where a defendant fails to sustain her evidentiary burden on a defense, the court is duty bound not to instruct the jury on the defense. United States v. Patrick, 542 F.2d 381 (7th Cir.1976), cert. denied 430 U.S. (1977) (citing United States v. Cullen, 454 F.2d 386, 390 (7th Cir.1971)). As mentioned above, to establish duress, a defendant must show:
 
 
 61
 (1) an immediate threat of death or serious bodily harm which requires the defendant commit the criminal act (immediacy);
 
 
 62
 (2) the situation must be one where there was no opportunity to avoid the danger (inescapability); and
 
 
 63
 (3) the offender must surrender once the threat abates.
 
 
 64
 Campbell, 675 F.2d at 821. In United States v. Gordon, the panel held that the trial judge properly did not instruct the jury on the defense of duress where the defendant's own testimony negated two elements of the defense--immediacy and inescapability. 526 F.2d 406, 408 (9th Cir.1975) ( cited with approval in Campbell, 675 F.2d at 821).
 
 
 65
 Here, Waddell's only proof of duress was her own testimony and that of her expert. Waddell's own testimony and the testimony of others, however, negated at least two elements of the defense. Waddell testified that during the August 4 robbery, although her cohort inside the bank was unarmed, and her other cohorts were outside in the car and posed no threat, she did not alert any tellers or bystanders to her situation. She did not tell anyone she was being forced to commit a robbery.
 
 
 66
 Moreover, prior testimony established that when Waddell redeemed her pawned jewelry, she appeared relaxed and acted normal. In fact, Waddell had clear opportunities to escape and call the authorities but did not do so. Further, on August 9, after Waddell argued with her "captors," the others rented a Cadillac and returned to Dayton without her. Waddell drove, by herself, from Columbus to Dayton. She never sought help, surrendered to police, nor alerted anyone to her predicament.
 
 
 67
 Waddell had opportunities to avoid the danger and she did not surrender when the alleged threat abated. Although the government did not cross-appeal this issue, based on the above, the district court was not required to instruct the jury on duress. In addition, as discussed below, the instruction given was proper.
 
 
 68
 2. The Instruction Was Accurate and Sufficient
 
 
 69
 This court will uphold a district court's refusal of a defendant's proposed jury instruction where "the instruction as given is accurate and sufficient." United States v. Williams, 952 F.2d 1504, 1512 (6th Cir.1991). We must read the substituted instructions "as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." Id. The Williams panel further noted that a refusal to deliver a requested instruction was reversible error only if the requested instruction was:
 
 
 70
 (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.
 
 
 71
 952 F.2d at 1512 (citations omitted).
 
 
 72
 Here, the district court's instruction fairly and adequately submitted the issues and applicable law to the jury. The instruction Waddell requested provided:
 
 
 73
 (1) One of the questions in this case is whether defendant was coerced, or forced, to commit the crime.
 
 
 74
 (2) Coercion can excuse a crime, but only if the defendant reasonably feared that she would immediately be killed or seriously hurt if she did not commit the crime, and there was no reasonable way for her to escape.
 
 
 75
 (3) The government has the burden of proving that the defendant was not coerced. For you to find the defendant guilty, the government must prove that her fear was unreasonable. In other words, the government must prove that it was not reasonable for her to think that committing the crime was the only way to save herself from death or serious bodily harm. Unless the government proves this beyond a reasonable doubt, you must find her not guilty.
 
 
 76
 (JA p. 23, Defendant's Motion Requesting Special Jury Instructions, citing Pattern Jury instructions of 6th Cir, No. 6.05 (1991) (Emphasis added). The instruction given by the district court read:
 
 
 77
 Coercion or duress would be established if, at the time of the offense charged, all of these factors were present:
 
 
 78
 One, there was an immediate or imminent threat of death or serious bodily injury to defendant if she did not commit or participate in the commission of the crime.
 
 
 79
 Two, the defendant had a reasonable fear that the threat of death or serious bodily injury would be carried out.
 
 
 80
 Three, the defendant had no reasonable opportunity to escape the threatened harm.
 
 
 81
 The government has the burden of proving the absence of coercion beyond a reasonable doubt. The government may meet its burden by proving beyond a reasonable doubt that at least one of these three factors which constitute coercion was not present in this case. In other words, to convict the defendant, you must find that the government has proved that no immediate threat of death or serious bodily injury occurred, or that defendant's fear of death or serious bodily injury was unreasonable, or that defendant had a reasonable opportunity to escape and that it was not reasonable for her to think that committing the crime was the only way to save herself from death or serious bodily harm. If you find that the government has failed to prove coercion beyond a reasonable doubt, then you must find the defendant not guilty. You should consider the question of coercion separately as to each count of the indictment.
 
 
 82
 (Appellant's brief at 24; Appellee's brief at 18-19) (emphasis added).
 
 
 83
 Waddell argues the differences between the two instructions, noted in italics, constituted reversible error. Waddell alleges her proposed instruction provided a subjective view of reasonableness thus focusing the jury on whether the "psychological impairments of this defendant might make her think that commission of the crime is 'her only way out' in the same circumstances where another person, with a different psychological makeup would not reach that conclusion." The instruction given, according to Waddell, frames the reasonableness inquiry as an objective question which asks "would a reasonable person in these circumstances have thought the commission of the crime was the only way to save herself."
 
 
 84
 First, Waddell's argument focuses on the wrong portion of the given instruction. Close examination shows that the challenged language, pertaining to whether a defendant believed the commission of the crime was her only choice, constitute a subjective inquiry in both instructions. In fact, the language read to the jury mirrors that from the requested instruction.[7] In fact, the only arguably objective inquiry appears within the given language of whether "defendant had a reasonable fear that the threat of death or serious bodily injury would be carried out" as opposed to the requested language of whether "the defendant reasonably feared that she would immediately be killed or seriously hurt." Waddell does not appeal this difference. Even if she had, the language "reasonably feared" is virtually identical to that of "had a reasonable fear" and neither version presents a clearly subjective nor objective inquiry.
 
 
 85
 It is questionable whether the jury should have been instructed on this defense where Waddell provided insufficient proof of all the elements of the affirmative defense. The instructions given, however, were virtually identical to those requested and accurately and sufficiently presented the defense of duress as required in this Circuit. In summation, the district court's failure to give Waddell's requested instruction did not substantially impair her defense and no reversible error occurred.
 
 C. The Evidence was Sufficient
 
 86
 Waddell next argues that the evidence presented was insufficient to sustain the jury's verdict. We disagree.
 
 
 87
 We review questions of the sufficiency of the evidence for "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also United States v. DeClue, 899 F.2d 1465, 1471 (6th Cir.1990).
 
 
 88
 The evidence in this case, viewed in the light most favorable to the government, supports the jury's verdict. Here, Brooks, Kermon, James and Walker testified under agreements with the government. Their testimony revealed that Waddell was directly involved with the August 4 and 10 robberies and that Waddell was aware of, and profited from, the other robberies. Moreover, Waddell conspired to commit other bank robberies and used robbery proceeds to purchase drugs and to redeem pawned jewelry. Additionally, surveillance photos revealed Waddell's presence at the Star Bank and her demands to the teller for more money. Further, the evidence clearly established that Waddell willingly participated in this string of robberies.
 
 D. Sentencing issues
 1. Acceptance of Responsibility
 
 89
 Waddell next argues the district court's refusal to grant her a two-level reduction for acceptance of responsibility amounted to clear error. She alleges that the district court erroneously based its denial on her assertion of the defense of duress. Waddell argues that although she put the government to its proof, her testimony admitting her participation in the crimes showed the requisite acceptance of responsibility. We disagree.
 
 
 90
 Section 3E1.1 of the United States Sentencing Guidelines allows a two-level reduction for acceptance of responsibility where the "defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. Sec. 3E1.1 (1991). An application note explains that:
 
 
 91
 [t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.... In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt. ... a determination that a defendant has accepted responsibility will be based primarily on pre-trial statements and conduct.
 
 
 92
 U.S.S.G. Sec. 3E1.1, comment. (n. 2) (1991).
 
 
 93
 The defendant bears the burden of proving an entitlement to a reduction for acceptance of responsibility. United States v. Rodriguez, 896 F.2d 1031, 1033 (6th Cir.1990). We review a district court's findings about acceptance of responsibility for clear error and we accord the trial judge's determination great deference. United States v. Downs, 955 F.2d 397, 400 (6th Cir.1992), cert. denied --- U.S. ----, 114 S.Ct. 733 (1994).
 
 
 94
 Although the probation officer recommended a reduction for acceptance of responsibility, the district court found that Waddell failed to prove an entitlement to the reduction.[8] The district court denied the reduction, stating:
 
 
 95
 Now, in this case, the defendant never, ever accepted responsibility for the culpability of her conduct. She maintained that she was acting under duress or under the influence of drugs and never, ever accepted responsibility for knowingly and willfully participating in this conspiracy which involved robbing banks or actually knowingly and willfully robbing banks.
 
 
 96
 * * *
 
 
 97
 * * *
 
 
 98
 She claimed that she was acting under duress, that she was being coerced into becoming a member of this conspiracy and participating in these bank robberies, that she was held against her will, that she was being injected with drugs, etc. This was the factual foundation for her legal theory that she asserted in her defense, but it is the facts that the Court concludes, and her own testimony, that was just so incredible and unbelievable in which this court, based upon the evidence it heard at trial, rejects, and it is the fact that she maintained that position and told that story in an attempt to escape responsibility for her actions that leads the Court to conclude that she is not entitled to credit for acceptance of responsibility ... the evidence shows that she did these things willingly and voluntarily.
 
 
 99
 (JA p. 238-39)
 
 
 100
 Waddell correctly notes we have held that district courts may consider a reduction for acceptance of responsibility where the defendant raises entrapment as a defense. United States v. Fleener, 900 F.2d 914 (6th Cir.1990) (upheld reduction where defendant voluntarily surrendered tapes and letters to agents executing a search warrant). In Fleener, however, the Guidelines language was more lenient and, more importantly, the defendant's conduct clearly demonstrated his acceptance of responsibility. Fleener, 900 F.2d at 918.
 
 
 101
 Here, the sentencing judge did not clearly err in its credibility determination that Waddell's incredible testimony did not demonstrate an acceptance of responsibility. Waddell failed to show any affirmative acts of acceptance of responsibility other than her testimony that she indeed committed the acts. Waddell's incredible testimony, which the court disbelieved, indicated no acceptance of responsibility. Although a duress defense does not preclude a reduction for acceptance of responsibility, a defendant must prove such acceptance. Here, Waddell did not prove acceptance of responsibility and the district court correctly denied a reduction.
 
 
 102
 2. Waddell Was Not Entitled to a Reduction Based on an Imperfect Duress Defense
 
 
 103
 Finally, Waddell argues the sentencing judge erred by applying an objective standard to its factual determination of the existence of duress for sentencing purposes. She also argues that the district court refused to consider an imperfect defense of duress as a basis for a downward departure. First, Waddell's argument concerning an erroneous objective standard fails for reasons set out in part II.B.2. For the reasons discussed below, the district court's decision not to depart is not cognizable on appeal.
 
 
 104
 Section 5K2.12 allows a sentencing court to depart below the applicable Guideline range if the defendant committed the offense because of serious coercion or duress, under circumstances not amounting to a complete defense. The Guideline provides, inter alia:
 
 
 105
 Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.
 
 
 106
 U.S.S.G. Sec. 5K2.12 (1991).
 
 
 107
 This court has held that the failure to depart downward under Sec. 5K2.12 is not cognizable on appeal if:
 
 
 108
 (1) the District Court properly computed the guideline range, (2) the District Court was not unaware of its discretion to depart downward from the guideline range, and (3) the District Court did not impose the sentence in violation of law or as a result of the incorrect application of the Sentencing Guidelines.
 
 
 109
 United States v. Chalkias, 971 F.2d 1206, 1217 (6th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 351 (1992) (citations omitted). Waddell appears to argue the sentencing judge was unaware of his ability to consider a downward departure.
 
 
 110
 Regarding a departure for an imperfect defense of duress, the district court quoted the language of Sec. 5K2.12 and stated:
 
 
 111
 [t]he Court finds that the evidence in this case does not support the proposition that this defendant acted under coercion or duress ... the Court finds by a preponderance of the evidence, based upon the testimony at the trial of this case, that this defendant voluntarily and willfully participated in this conspiracy and in these bank robberies; that she was not under any duress or coercion, and she voluntarily participated, she did so for financial gain in order to obtain drugs; that any drugs administered to her by others were administered by her own consent or request; that any altercations she was involved in at her home with co-conspirators were brought on by her attempt to conceal or steal part of the robbery proceeds.
 
 
 112
 (JA p. 246) The court then noted that any PTSD likely arose from her arrest and trial and found no grounds for departure in this case.
 
 
 113
 The above statement evidences the sentencing judge's awareness of his authority to depart under Sec. 5K2.12. The judge declined to depart because the evidence did not establish even an imperfect defense of duress. He then imposed a sentence within the proper Guidelines range. Because Waddell's sentence represents a correct Guideline application and was not imposed in violation of law, it is not cognizable on appeal.
 
 III. Conclusion
 
 114
 For the reasons stated above, we AFFIRM the jury convictions and sentences imposed by the Honorable James L. Graham, United States District Judge for the Southern District of Ohio.
 
 
 
 *
 The Honorable Charles W. Joiner, United States Senior District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 Both parties stipulated to all amounts referenced
 
 
 [3]
 Apparently, Waddell did not want Brooks to know that she was an intravenous drug user
 
 
 [4]
 It was later determined that approximately $3,000 was stolen from the NBD bank
 
 
 [5]
 Dr. Hurt administered the Minnesota Multiphasic Personality Inventory test; the Million Instrument for Personality Disorders; the Tennessee Self Concept Scale; the Shipley Institute of Living Scale; the Kaufman Brief Intelligence Test; The Impact of Events Scale; the Weschler Adult Intelligence Scale; and the Bender Visual Motor Gestalt test
 
 
 [6]
 In its entirety, Rule 703 provides:
 Bases of Opinion Testimony by Experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence.
 Fed.R.Evid. 703
 
 
 [7]
 Comparing the two versions, the disputed language is virtually identical:
 the government must prove that it was not reasonable for her to think that committing the crime was the only way to save herself from death or serious bodily harm. (requested language)
 and that it was not reasonable for her to think that committing the crime was the only way to save herself from death or serious bodily harm. (instruction given)
 
 
 [8]
 Notably, the Presentence Report also recommended a two-level increase for obstruction of justice based on Waddell's incredible testimony. Waddell objected to this increase and the district court sustained her objection